IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 2, 2020

**IN RE JAMES T. ET AL.**

**Appeal from the Juvenile Court for Montgomery County**
**No. 19-JV-1173, 19-JV-1176, 19-JV-1177, 19-JV-1178    Tim Barnes, Judge**

_____

**No. M2020-00111-COA-R3-PT**
_____

Mother appeals the termination of her parental rights on grounds of persistence of conditions, mental incompetence, and failure to manifest a willingness and ability to assume custody. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and THOMAS R. FRIERSON, II, J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Celia M.T.

Herbert H. Slatery, III, Attorney General and Reporter; Amber L. Seymour, Assistant Attorney General, Tennessee, for the appellee, Tennessee Department of Children's Services.

**MEMORANDUM OPINION[1]**

**PROCEDURAL AND FACTUAL HISTORY**

---

[1] Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

> This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

Respondent/Appellant Celia M.T. ("Mother")[2] is the parent of four children, ranging in ages from eight to sixteen by the time of trial. The children were removed from Mother's custody in November 2017, due to allegations of environmental and educational neglect. Specifically, it appears undisputed the home where the family lived was in a dilapidated and filthy condition with no running water or heat. The Tennessee Department of Children's Services ("DCS") filed a petition to declare the children dependent and neglected in Montgomery County Juvenile Court ("the trial court"), which they assert was later granted.[3]

DCS filed a petition to terminate Mother's parental rights in the trial court on July 12, 2019.[4] As grounds for termination, the petition alleged substantial noncompliance with permanency plans, persistence of conditions, mental incompetence, and failure to manifest an ability and willingness to assume custody. Trial on the termination petition occurred on November 19, 2019.

DCS caseworker Ellen Spivey testified that she was Mother's caseworker for the entirety of DCS's involvement with the children following the removal.[5] According to Ms. Spivey, DCS attempted to work with Mother toward reunification, by helping Mother identify housing and paying utility deposits on Mother's behalf, supervising visitation, providing Mother with clothing and dishes for a new home, and paying for a psychological evaluation. DCS also created four permanency plans for Mother and explained the criteria for termination of parental rights to her.[6]

Mother made progress on the first permanency plan, and a trial home visit occurred from February 5, 2017 to March 5, 2017. The visit was terminated however, because Mother was cohabitating with a registered sex offender ("Boyfriend"). Specifically, Ms. Spivey testified without objection that her investigation revealed that Boyfriend was convicted of the crime of rape of a child in 1995. According to Ms. Spivey, the home also lacked food and was filthy. DCS also received calls during the trial home visit from the children's schools concerned about the children being left outside of Mother's home after school without keys. Following the termination of the trial home visit, DCS provided more intensive parenting and homemaking services to Mother.

---

[2] In termination of parental rights cases, we do not use full names in order to protect the privacy of those involved.

[3] No order to this effect is included in the appellate record.

[4] The petition also sought to terminate the parental rights of the children's father, which the trial court granted. His parental rights are not at issue in this appeal.

[5] Mother later reported in a psychological evaluation that DCS had "a whole lot" of prior involvement with her and the children, but it does not appear that it ever escalated to removal prior to November 2017.

[6] According to the caseworker, Mother's counsel advised her not to sign the criteria document.

Dr. Janie L. Berryman, Ed.D., conducted a psychological evaluation of Mother and issued a report thereon on July 31, 2018. Dr. Berryman's testimony confirmed that Mother's verbal IQ was below average, while her non-verbal and composite scores were in the "lower extreme." Dr. Berryman thus found that Mother was "functioning in the mild to moderate intellectual range" and that she did not understand the significance of allowing her children to live with a convicted sex offender. Rather, Mother insisted that her boyfriend was innocent and blamed DCS's involvement on race. Dr. Berryman also found that Mother was overwhelmed by the duties of parenting and that she would benefit from hands-on parenting training, but indicated that Mother may not cooperate or comprehend the training due to her anger and functioning issues. Dr. Berryman also recommended therapy, but noted that Mother was resistant. Based on the findings of the evaluation, Dr. Berryman also recommended that visitation be supervised and that Mother complete therapeutic parenting instruction and therapy. According to DCS, they attempted to provide these services, but Mother generally resisted their help. Ms. Spivey testified that based on Dr. Berryman's report, her education and experience as a caseworker, and her involvement with Mother, she believed that Mother's parenting issues were at least in part due to her intellectual functioning.

Mother testified briefly at trial; she could not state the age of any of her children. There was no dispute that Mother visited the children before visitation was terminated. Mother also spoke to the children on the phone, but the calls lasted approximately three minutes between all of the four children. Mother maintained contact with DCS, but did not attend medical and educational meetings concerning the children and did not pay child support. Mother testified however, that she provided gifts for the children. Mother also confirmed that she asked for photographs of the children because she loves them and worries about them.

According to DCS, however, Mother was still cohabitating with Boyfriend at the time of trial. Mother's DCS caseworker testified that Mother was unwilling to require that he leave the residence, despite being informed that he was a barrier to reunification by the juvenile judge, DCS, foster parents, and her own attorney. Ms. Spivey testified to her belief that Mother's intellectual abilities made it unlikely that Mother could improve her situation in the near future.

By the time of trial, the children had been residing in the same foster home for two years, with the exception of the trial home visit.[7] Foster Mother testified that she actually knew the children prior to removal because she teaches at the elementary school that the children attended. Moreover, even during the home visit, the children's foster mother still had close contact with the children, such as taking them to church and the movies. The children all take part in various weekly activities, such as sports and church. One child also

---

[7] Other than the very first week following removal, the children had been residing in this foster home for the entirety of their time removed from Mother.

attends weekly occupational and physical therapy sessions. The children love their foster parents and have expressed a desire to be adopted. Likewise, the foster family wishes to adopt all four of the children if given the opportunity. The children have thrived in the foster home.

The testimony showed that although the children love Mother, they were not physically affectionate with her and did not have a strong bond with her. Foster Mother did testify, however, that she had a generally good relationship with Mother, that they would talk weekly, and that she would send photographs of the children to Mother. Foster Mother also testified, however, that Mother's openness to contact had become more limited, as Mother believed that the foster family had taken her children from her. Nevertheless, Foster Mother testified that she continued to help Mother even when the children were on the home visit. Foster Mother testified that she did not believe that Mother could parent the children without support and that Mother "won't do what she's supposed to do to get the support." When asked if it would be safe for the children to be around Boyfriend, Foster Mother replied "[a]bsolutely not." Foster Mother further testified that she "begged" Mother to leave Boyfriend so that Mother could be reunified with the children, but that Mother refused.

Following the conclusion of the proof, the trial court orally ruled that Mother's parental rights would be terminated as to all four children. The trial court thereafter entered a written order granting the petition to terminate on Janaury 13, 2020. Following Mother's appeal, this Court remanded the matter to the trial court "for the limited purpose of resolving any differences between the trial court's oral ruling and its written order and for entry of a new order under Tenn. Code Ann. § 36-1-113(k)." The trial court entered an amended order on September 3, 2020, in which it found three grounds for termination of Mother's parental rights: (1) persistence of conditions; (2) mental incompetence; and (3) failure to manifest an ability and willingness to assume custody. The trial court further ruled that termination was in the children's best interests.

## ISSUES PRESENTED

Mother designated as an issue only the trial court's finding that termination of her parental rights was in the children's best interest. Based on the express direction of our supreme court, we must also review whether sufficient evidence was presented to support the trial court's findings as to the grounds for termination. *In re Carrington H.*, 483 S.W.3d 507, 526–26 (Tenn. 2016) (directing us to consider all grounds found by the trial court whether appealed by the parent or not).

## ANALYSIS

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*Id.* at 522–23 (footnote omitted). In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113; *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interests by clear and convincing evidence. Tenn. Code Ann. § 36-3-113; *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393

(Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). Our Supreme Court further explains:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## I. Grounds

In this case, the trial court found that three grounds supported termination of Mother's parental rights: (1) persistence of conditions; (2) mental incompetence; and (3) failure to manifest an ability and willingness to assume custody. We will briefly consider each ground in turn.

### A. Persistence of Conditions

A ground for termination may be found under the following circumstances:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (A)(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of

the parent or guardian;

> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3).

In this case, DCS filed a petition to adjudicate the children dependent and neglected on November 13, 2017. There is no dispute that the children were eventually adjudicated dependent and neglected, although this order is not contained in the record on appeal.[8] Regardless, the record does contain both a November 13, 2017 protective custody order removing the children from Mother's custody and placing them in DCS custody, as well as a March 1, 2018 preliminary order finding that there was probable cause to believe that they were dependent and neglected. These orders were "entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child[.]" *Id.* And these orders were entered more than six months prior to the termination trial. This ground is therefore applicable.

The record also contains clear and convincing evidence that conditions exist that in all reasonable probability prevent the children's safe return to Mother. Here, Ms. Spivey testified without dispute that Mother continued to reside with a man who had been previously convicted of rape of a child. Although Mother was informed that DCS would not allow the children to return to her with Boyfriend present, Mother refused to break off the relationship and the proof shows that she was unlikely to do so in the near future. Indeed, according to Dr. Berryman, Mother did not comprehend the issue with Boyfriend remaining in the home with her children. Finally, we must agree that the continuation of the legal relationship with Mother prevents the children from being adopted, which both the children and the foster family desire. Under these circumstances, the trial court did not err in finding clear and convincing evidence to support this ground for termination.

### B.  Mental Incompetence to Car and Provide for the Children

A second ground for termination occurs when clear and convincing evidence is

---

[8] Mother concedes in her brief that the children were adjudicated dependent and neglected and admits that four permanency plans were created following the children's removal.

presented that a

> [P]arent or guardian of the child is incompetent to adequately provide for the
> further care and supervision of the child because the parent's or guardian's
> mental condition is presently so impaired and is so likely to remain so that it
> is unlikely that the parent or guardian will be able to assume or resume the
> care of and responsibility for the child in the near future . . .

Tenn. Code Ann. § 36-1-113(g)(8)(B)(i). In proving this ground, "no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]" Tenn. Code Ann. § 36-1-113(g)(8)(C). When applying this ground, Tennessee courts have consistently held that "'[a] parent's continued incapacity to provide fundamental care for a child, whether caused by mental illness, mental impairment, or some other cause constitutes sufficient ground for termination of parental rights.'" *In re Eric G.*, No. E2017-00188-COA-R3-PT, 2017 WL 4844378, at *11 (Tenn. Ct. App. Oct. 25, 2017) (quoting *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *7 (Tenn. Ct. App. Apr. 21, 2004)). The ground "'serves to protect children from harm caused by a parent who is incapable of safely caring for them.'" *In re Samuel R.*, No. W2017-01359-COA-R3-PT, 2018 WL 2203226, at *9 (Tenn. Ct. App. May 14, 2018), *perm. app. denied* (Tenn. Aug. 13, 2018) (quoting *In re Lena G.*, No. E2016-00798-COA-R3-PT, 2017 WL 2304448, at *25 (Tenn. Ct. App. May 26, 2017)).

In this case, the trial court found that Dr. Berryman's report established that Mother was unable to properly parent her children due to her mental impairment and that there was little chance that Mother would be able to remedy these issues in the near future. We agree. At trial, Mother was unable to even state the ages of her own children. Dr. Berryman's report indicates that Mother has low intellectual functioning that has resulted in both her difficulty with hands-on parenting and her inability to comprehend the significance of her continued cohabitation with Boyfriend. Ms. Spivey confirmed her belief that Mother's intellectual functioning contributed to her inability to parent her children. Dr. Berryman further opined that although Mother could benefit from significant training and treatment, but her own anger and refusal to cooperate were a barrier to progress. These issues indicate that should the children be returned to Mother, she would likely be unable to provide the level of care necessary both to protect her children and to prevent a future removal. Under these circumstances, the trial court did not err in finding clear and convincing evidence of this ground for termination.

### C. Willingness and Ability

A third ground for termination exists when

A parent or guardian has failed to manifest, by act or omission, an ability and

- 8 -

willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child . . . .

Tenn. Code Ann. § 36-1-113(g)14). Essentially, the statutory ground has two distinct elements which must be proven by clear and convincing evidence:

> (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*In re Neveah M.*, -- S.W.3d --, 2020 WL 7258044, at *11 (Tenn. Dec. 10, 2020). Because there was some disagreement in this Court as to the proper interpretation of the first prong, the Tennessee Supreme court recently clarified that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *Id.* at *14 (relying on *In re Braelyn S.*, E2020-00043-COA-R3-PT, 2020 WL 4200088, at *15 (Tenn. Ct. App. July 22, 2020), *perm. app. denied,* (Tenn. Dec. 10, 2020)).

In this case, clear and convincing evidence demonstrates that Mother has manifested neither the ability nor the willingness to assume either legal or physical custody of the children. Mother has refused to take action to remove Boyfriend from her residence even though she has been told repeatedly that his presence is a barrier to reunification. Mother has also failed to take advantage of the support necessary that would make her able to parent her children. And even if Mother's low mental functioning contributes to this unwillingness, discussed *supra*, these issues render her unable to parent her children. Finally, the evidence, particularly the presence of a convicted child rapist in Mother's home, indicates that placing the children in Mother's custody would put them at significant risk for harm. The trial court's decision as to this ground is therefore affirmed.

## II. Best Interests

Because at least one ground for terminating parental rights is supported by clear and convincing evidence, we now consider whether the trial court erred in finding that termination of Mother's parental rights was in the best interest of the children. After a ground of termination is established, "the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005)). The best interests of the children may not always lead to termination, even if a parent is deemed unfit by a court. *Id.*

To determine whether termination of parental rights is in a child's best interests, the

court shall consider, but is not limited to, the following factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). Further, our Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

***In re Gabriella D.***, 531 S.W.3d 662, 681–82 (Tenn. 2017) (internal citations omitted). Determining the best interests of a child "involves more than a 'rote examination' of the statutory factors" or simply "tallying the number of statutory factors weighing in favor of or against termination." ***Id.*** at 682 (quoting ***In re Audrey S.***, 182 S.W.3d at 878). Each analysis must remain "factually intensive," and consideration of the factors should be rooted in each case's unique facts and circumstances. ***Id.***

In the present case, an analysis of the combined weight of these factors establishes clear and convincing evidence that termination of Mother's parental rights is in the best interests of the children. In our view, many factors clearly favor termination. First, the evidence clearly shows that despite the efforts of DCS, Mother has simply not made a lasting adjustment of circumstances that would make it safe for the children to return to her care. *See* Tenn. Code Ann. § 36-1-113(i)(1)–(2). Here, when Mother was given an opportunity to parent her children in the trial home placement, she was soon plagued by the environmental and food neglect issues that resulted in their removal. And Mother still cohabitates with a man that was undisputedly convicted of raping a child.

The lack of meaningful relationship between Mother and the children is also significant. *See* Tenn. Code Ann. § 36-1-113(i)(4); *see also* ***In re Addalyne S.***, 556 S.W.3d 774, 795 (Tenn. Ct. App. 2018) ("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor. . ."); ***In re Terry S.C.***, No. M2013-02381-COA-R3-PT, 2014 WL 3808911, at *18 (Tenn. Ct. App. July 31, 2014) ("[P]erhaps most importantly, [the mother] has failed to maintain regular visitation with the children and therefore has no meaningful relationship with them."). Although there is no dispute that Mother loves the children, the evidence shows that they do not have a meaningful relationship with her. Indeed, the evidence shows that Mother has chosen her continued relationship with Boyfriend over the maintenance of her relationships with her own children. This factor heavily favors termination.

A change in caretakers and physical environment would also be detrimental to the children. *See* Tenn. Code Ann. § 36-1-113(i)(5). The children are bonded to their foster family and thriving. Fortunately, all of the children were able to be placed together and both the children and the foster family are looking forward to adoption. In contrast, a return to Mother's care could lead to the same issues that led to the initial removal and the termination of the home placement: a lack of food, environmental neglect, and contact with a sex offender who victimized a child. *See* Tenn. Code Ann. § 36-1-113(i)(6) (involving whether the child or another was subject to neglect or abuse by the parent or someone residing with the parent); Tenn. Code Ann. § 36-1-113(i)(7) (involving whether the parent's home is healthy and safe). Moreover, Mother's mental state certainly does not support a finding that she can care for four children without significant support, which she is unwilling to accept. *See* Tenn. Code Ann. § 36-1-113(i)(8).

Of course, not all of the factors clearly favor termination. Mother has maintained visitation when able. *See* Tenn. Code Ann. § 36-1-113(i)(3). Although Mother has not paid support, it is not clear from the record that she was able to do so or that she was capable of taking the practical steps necessary to ensure garnishment of her disability payments. *See* Tenn. Code Ann. § 36-1-113(i)(9). Still, these few factors in Mother's favor do not outweigh the significant obstacles that prevent Mother from parenting her children. In her brief, Mother argues that she "showed a willingness to try to follow [DCS's] instructions" and essentially contends that she should not be prevented from parenting her children due to "a low functioning IQ" because Mother "is getting back on her feet." Once a ground for termination has been found, however, the focus is not on the parent, but on the children:

> Decisions regarding the termination or preservation of parental rights are neither a punishment to be meted out nor an award to be rendered to a parent. Even if a parent has made a number of commendable changes to his or her lifestyle, this alone may not be sufficient to establish that it is in the child's best interest for the parent to retain his or her parental rights . . . .

*In re Kaedince M.*, No. E2015-00763-COA-R3-PT, 2015 WL 6122776, at *7 (Tenn. Ct. App. Oct. 19, 2015). Respectfully, the evidence at trial did not show that Mother was "getting back on her feet." Instead, the issues that led to the removal of the children initially and from the trial home placement still exist. Most egregiously, Mother continued to reside with a convicted child rapist with no plans to terminate the relationship. In contrast, the foster family has provided a safe, stable, and loving environment for the children for the last two years of their lives. And they wish to continue to do so in the future. The children deserve that chance. As such, we affirm the trial court's finding that clear and convincing evidence was presented that termination was in the best interests of the four children at issue in this case.

## CONCLUSION

The judgment of the Montgomery County Juvenile Court is affirmed in all respects. Costs of this appeal are taxed to Appellant Celia M.T., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE